**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AARON GREENSPAN**, <br><br> Plaintiff, <br><br> v. <br><br> **BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**, <br><br> Defendant. | Case No. 1:21-cv-01968 (TNM) |

**MEMORANDUM OPINION**

One word from the mouth of a Federal Reserve Board Member can move markets.  One word can determine whether investors gain or lose millions of dollars.  Consider the outcry over the Board's removal of "patient" from a 2015 policy statement.  Eliminating this seemingly innocuous word dramatically drove down the Dow Jones until the Board backtracked.[1]

This case raises the sensitive question of whether a journalist may obtain certain communications sent and received by Federal Reserve Board Chairman Jerome H. Powell under the Freedom of Information Act.  The journalist requested emails from Powell containing the keywords "bubble" and "tantrum" in specific contexts.  After reviewing over 1,600 responsive records, the Board produced only a few.  It withheld the lion's share under FOIA Exemption 5, explaining that the documents are predecisional, deliberative, and their release would foreseeably cause harm.  The Board also withheld a few responsive records under FOIA Exemption 4,

---

[1] *See* Megan Woolhouse, *When Fed Speaks, a Single Word Can Move Markets*, Boston Globe, (Mar. 18, 2015), https://www.bostonglobe.com/business/2015/03/17/when-fed-speaks-single-word-can-move-markets/DTP6zU5IYSUbOzLfJn2UUP/story.html; *see also* Jeff Cox, *Fed Removes 'Patient' But Says No April Hike Coming*, CNBC, (Mar. 18, 2015), https://www.cnbc.com/2015/03/18/fed-removes-patient.html.

arguing that they contain confidential commercial or financial information.  Before the Court are

the parties' cross-motions for summary judgment.  Because the Court finds that the Board

properly asserted Exemptions 4 and 5, it will grant the Board's motion and deny the journalist's

motion.

I.

Data journalist Aaron Greenspan runs the website PlainSite.  *See* Compl. ¶ 4, ECF No. 1.

Greenspan filed two FOIA requests with the Board seeking emails and text messages to or from

Powell containing the words "bubble" or "tantrum" from January 2018 to February 2021.  *Id.* ¶¶

12, 18.  After consulting with the Board, Greenspan narrowed his first request to emails using the

word "bubble" in the context of the "housing market, stock market, debt, dot-com, asset, and

credit bubbles."  Decl. of David G. Caperton (Caperton Decl.) ¶ 6, Ex. C (quoting first request),

ECF No. 11-4; *see also* Compl. ¶ 15.  And Greenspan narrowed his second request to emails

using the word "tantrum" in the context of "any previous or future 'taper tantrum' (referring to

the tapering of bond purchases, otherwise known as 'Quantitative Easing' or 'QE')."  Caperton

Decl. ¶ 10, Ex. G (quoting second request).

The Board then began searching for responsive information.  It uncovered hundreds of

pages of "high-level internal, deliberative emails and attachments to and from Chair Powell and

the staffs of the Board and Federal Reserve Banks."  Def.'s Mot. for Summ. J. (Def.'s MSJ) at 2,

ECF No. 11-1.  The Board began processing these pages and provided periodic updates to

Greenspan.  *See* Caperton Decl. ¶ 7.

Greenspan sued soon after asking this Court to compel production of responsive records

and to order the Board to grant him a fee waiver.  *See* Compl. at 4.  After Greenspan sued, the

Board granted his request for a fee waiver and released 14 records responsive to his "bubble"

2

request, with redactions. *See* Caperton Decl. ¶ 8. The Board also informed Greenspan that it would be withholding about 963 pages of responsive information under FOIA Exemptions 4 and 5. *See id.* The Board also released three records responsive to Greenspan's "tantrum" request and withheld around 693 pages under FOIA Exemptions 4, 5, and 6. *See id.* ¶ 12. After further review and consultation, the Board produced another four pages in full and 21 pages with redactions under FOIA Exemptions 5 and 6. *See id.* ¶ 14.

In total, the Board claims Exemption 5 for over 1600 pages and Exemption 4 for ten pages. *See* Def.'s MSJ at 7 n.5; Caperton Decl. ¶ 17, Exs. K, L (*Vaughn* Indices). The Board also invokes Exemption 5 for three of the ten pages it withheld under Exemption 4. *See* Def.'s MSJ at 7 n.5; Caperton Decl. ¶ 17. The Board withheld all these documents in full. *See* Caperton Decl. ¶ 17; *see also Vaughn* Indices.

The parties cross-moved for summary judgment. The Board argues that it properly withheld information under FOIA Exemptions 4 and 5 and that it released all reasonably segregable non-exempt information. *See generally* Def.'s MSJ. Greenspan challenges some of the Board's Exemption 5 withholdings and all of its Exemption 4 withholdings. *See generally* Pl.'s Cross-Mot. for Summ. J. (Pl.'s MSJ), ECF No. 12-1. Greenspan does not challenge the adequacy of the Board's searches or its withholdings under Exemption 6, *see* Third Joint Status Report at 1, ECF No. 8; Caperton Decl. ¶ 13, or the Board's representations about segregability, *see generally* Pl.'s MSJ; *see also* Def.'s Reply at 1, ECF No. 14. These cross-motions for summary judgment are now ripe. This Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## II.

Courts resolve the "vast majority" of FOIA cases at summary judgment. *See AARC v.*

3

*CIA,* 317 F. Supp. 3d 394, 399 (D.D.C. 2018), *aff'd,* 781 Fed. App'x 11 (D.C. Cir. 2019) (per curiam).  To prevail on a motion for summary judgment, a party must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.  And a factual dispute is material if it could alter the outcome of the suit under the substantive governing law. *See id.*

FOIA requires "disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions[.]"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  To obtain summary judgment, the agency bears the burden to show that any claimed exemptions apply.  *See ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).  This burden does not shift even when the requester cross-moves for summary judgment. *See Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017).  Courts construe FOIA exemptions narrowly, *see Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011), and consider their applicability de novo, *see King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

To meet its burden, an agency may rely on declarations describing the applicability of a FOIA exemption to information that the agency has withheld.  *See Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018).  Such declarations receive "a presumption of good faith."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based solely on the agency's declarations if neither record evidence nor evidence of the agency's bad faith contradicts them.  *See Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017).

Greenspan challenges all of the Board's Exemption 4 withholdings and some of its Exemption 5 withholdings.  *See* Def.'s MSJ at 7; Pl.'s MSJ at 2–6.  Exemption 4 shields from

4

disclosure privileged or confidential commercial or financial information obtained from a person.
*See* 5 U.S.C. § 552(b)(4).  And Exemption 5 protects records from disclosure "that would not be
available by law to a party other than . . . in litigation with the agency."  5 U.S.C.
§ 552(b)(5).  In other words, a FOIA requester cannot obtain by FOIA what he could only obtain
by suing the agency.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).

But an agency must demonstrate more than the bare applicability of an exemption.
Congress amended FOIA in 2016 to add a "foreseeable harm" requirement.  *See* 5 U.S.C.
§ 552(a)(8)(A)(i)(I).  To withhold exempt records, an agency must "reasonably foresee[] that
[their] disclosure would harm an interest protected by" a FOIA exemption.  *Id.*  Though agencies
could previously articulate a mere link between the withheld information and some foreseeable
harm, the D.C. Circuit has explained that this is no longer enough.  *See Reps. Comm. for
Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 109 (D.D.C. 2021) (describing this shift).

An agency must now make two showings.  First, as always, the agency must show that a
FOIA exemption applies to withheld information.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of
Treasury*, 802 F. Supp. 2d 185, 193 (D.D.C. 2011).  Second, the agency must provide a "focused
and concrete demonstration of why disclosure of the particular type of material" will cause
foreseeable harm "in the specific context of the agency action at issue."  *See Reps. Comm. for
Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021).  In other words, the agency
cannot merely state that disclosure "could . . . adversely impair internal deliberations" or chill
inter-agency speech; it must argue that disclosure *would* have that effect.  *Id.* at 369–70; *see also
Machado Amadis v. DOS*, 971 F.3d 364, 371 (D.C. Cir. 2020) (upholding an assertion of the
deliberative process privilege where an agency "specifically focused on the information at issue"
in the responsive records and "concluded that disclosure of that information 'would' chill future

internal discussions").  Finally, in some cases, "the sensitivity of the context in which [the responsive] conversations arose as well as their subject matter" may support a finding of foreseeable harm.  *Reps. Comm.*, 3 F.4th at 372.

### III.

The Court considers:  (A) the Board's withholdings under Exemption 4; (B) the Board's withholdings under Exemption 5; and (C) whether the Board satisfied FOIA's segregability requirement.[2]

### A.

The Board withheld a few documents that it received from two private firms under Exemption 4.[3]  Greenspan challenges all of its withholdings under this exemption.  *See* Pl.'s MSJ at 5–6.  To properly assert Exemption 4, the Board must show that the withheld information is (1) obtained from a person, (2) commercial or financial, and (3) confidential or privileged.  *See* 5 U.S.C. § 552(b)(4); *see also WP Co. LLC v. SBA*, 502 F. Supp. 3d 1, 12 (D.D.C. 2020).  FOIA defines "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2).

---

[2]  Recall that Greenspan does not challenge the adequacy of the Board's search.  *See* Joint Status Rep. ¶ 2, ECF No. 8; Caperton Decl. ¶ 13.  In any event, the Court would independently find that the search was adequate.  *Cf. Ctr. for Bio. Diversity v. U.S. Army Corps of Eng'rs*, 405 F. Supp. 3d 127, 139 (D.D.C. 2019) (explaining that "the Court has an independent duty to determine whether the government has met its FOIA obligations" even if a plaintiff does not challenge the adequacy of a search).  The Board determined where responsive records would be located and worked collaboratively with Greenspan to narrow the focus of his requests.  *See* Caperton Decl. ¶¶ 6, 10.  The agency has met its burden to "show that it made a good faith effort to conduct a search for the requested records."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

[3]  These documents are identified on the *Vaughn* Index as documents FRB_FOIA F-2021-00128 000267-268; FRB_FOIA F-2021-00128 000269-270; FRB_FOIA F-2021-00128 000271-272; and FRB_FOIA F-2021-000132-000672-675.  *See* Caperton Decl., Ex. K, ECF No. 11-4.

Information is "commercial" under Exemption 4 if the submitter has a "commercial

interest" in it.  *See Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319–20 (D.C.

Cir. 2006).  The D.C. Circuit has explained that "Exemption 4 is *not* confined only to records

that reveal basic commercial operations . . . or [that] relate to the income-producing aspects of a

business."  *Id.* at 319.  Its protection is broader.  For example, an entity has a commercial interest

in information if its disclosure "would help rivals to identify and exploit" a company's

competitive weaknesses.  *See id.* at 320.  Similarly, the Circuit found that a group of

manufacturers had a commercial interest in health and safety data submitted to a federal agency

because it used the data to gain marketing approval for its products.  *See Pub. Citizen Health*

*Rsch. Grp.*, *v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

Information is "confidential" under Exemption 4 if it is "customarily kept private, or at

least closely held, by the person imparting it" or "the party receiving it provides some assurance

that it will remain secret."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363

(2019); *accord Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992)

(applying the first part of the *Food Marketing* test).  The customarily-kept-private condition must

be met to properly assert Exemption 4.  *See Food Mktg. Inst.*, 139 S. Ct. at 2363.  But it is an

open question whether the assurance-of-secrecy condition must be.  *See id.*; *see also WP Co.*

*LLC*, 502 F. Supp. 3d at 12.

## 1.

The Board has properly asserted Exemption 4.  As a threshold matter, the Board submits

affidavits from individuals who work at the relevant private firms to support its claims.  *Cf. Ctr.*

*for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 110–11 (D.D.C. 2019) (noting that

affidavits must "be made on personal knowledge" and that an agency's description about how a third party treats information is insufficient).

     *First*, the Board explains that it obtained the withheld communications from "persons" as defined in FOIA:  MacroPolicy Perspectives LLC, a macroeconomic research firm, and Tudor Investment Corporation, a global investment firm.  *See* Decl. of Bronwyn Eckhardt (Eckhardt Decl.) ¶ 3, ECF No. 11-9; Decl. of Julia Coronado (Coronado Decl.) ¶ 3, ECF No. 11-10.

     *Second*, the withheld information is "commercial or financial" because Tudor and MacroPolicy assert a "commercial interest" in it.  *See Baker & Hostetler LLP*, 473 F.3d at 319–20.  Tudor claims that its communications with the Board contain the firm's "internal assessment of macroeconomic financial conditions," which is "central to Tudor's 'macro' trading and investment strategies, in which Tudor maintains a strong commercial interest."  Eckhardt Decl. ¶ 8.  Tudor also notes that if its internal assessments became public, "other traders and investment advisers might seek to replicate, or model, Tudor's trading," which would detrimentally affect the firm's clients.  *Id.* ¶ 9.

     Likewise, MacroPolicy explains that its email to the Board consists of "commercial concerns and market analysis by MacroPolicy and at least three of its clients."  Coronado Decl. ¶ 4. MacroPolicy also attests that the email's "consolidation of [] clients' commercial concerns is a core part of MacroPolicy's research and information gathering process."  *Id.* ¶ 9.  Both firms asserted a "commercial interest" in the information provided.  The emails contain internal analysis and models central to the firm's trading and investment strategies, the heart of the "commercial interest" requirement.  *See, e.g.*, *Baker & Hostetler LLP*, 473 F.3d at 319–20; *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

*Third*, the withheld emails are "confidential" because the two firms assert they would not customarily make such information public.  *See Food Mktg. Inst.*, 139 S. Ct. at 2363.  Tudor's declarant explains that the withheld information involves the firm's internal assessment of macroeconomic conditions, which it "customarily maintains . . . in confidence."  Eckhardt Decl. ¶ 9.  And all of the records from Tudor explain that they are "intended only for the addressee" and that if someone receives the communication inadvertently, any "use, dissemination, printing or copying is strictly prohibited."  *Id.* ¶ 14.  Similarly, MacroPolicy's declarant states that the withheld document she sent "contains consolidations of confidential conversations . . . that MacroPolicy does not disclose to the public."  Coronado Decl. ¶ 9.

MacroPolicy also alleges facts going to the second part of the *Food Marketing* test.  It asserts that it voluntarily provided information to Powell "under assurances" that the Board "would maintain the confidentiality of the information and not disclose it publicly."  *Id.* ¶ 11.  Such information is "undoubtedly relevant to determining whether commercial information possessed by the agency is confidential."  *WP Co. LLC*, 502 F. Supp. 3d at 16 (cleaned up).  MacroPolicy's declarant makes doubly sure that the withheld information is confidential.

Greenspan attacks the Board's claim that Tudor's information is confidential.  *See* Pl.'s MSJ at 5–6.[4]  Greenspan points to a line in Tudor's declaration that states, "there are occasions on which Tudor chooses to disclose macroeconomic views to its investors and/or the public."  *See id.* at 6 (quoting Eckhardt Decl. ¶ 12).  He contends that the Board has not adequately explained whether the information withheld here is of the sort that Tudor has disclosed.  *See id.*

---

[4]  Greenspan does not challenge the Board's Exemption 4 withholdings as to the MacroPolicy documents.  *See generally* Pl.'s MSJ.

But that is not the test.  Rather, the Board must show that the withheld communication contains information that Tudor has "customarily and actually treated as private."  *Food Mktg. Inst.*, 139 S. Ct. at 2366.  That Tudor sometimes discloses other macroeconomic information—which it does "only in limited circumstances and for strategic reasons," Eckhardt Decl. ¶ 12—does not defeat its claim that it customarily and actually treated the withheld information as private.  Indeed, many indicia exist to suggest that Tudor did consider these specific emails to the Board private.  *See* Def.'s Reply at 28 (quoting Eckhardt Decl. ¶¶ 12–15).  The Board properly asserts Exemption 4.

## 2.

Finally, foreseeable harm.  Assuming this requirement applies to Exemption 4, as the parties do, the Board must explain how disclosure "would harm an interest protected by this exemption, such as by causing genuine harm to [] economic or business interests."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 (cleaned up).  Though Greenspan contests the Board's assertion of foreseeable harm, the Court finds that it has carried its burden.

Both the Tudor and MacroPolicy declarants explain how disclosure of the withheld information would directly harm their economic or business interests.  Tudor explains that if the emails at issue were disclosed "other traders and investment advisers might seek to replicate, or model, Tudor's trading [which] . . . would have a detrimental impact on Tudor's clients and the performance of Tudor's client funds."  Eckhardt Decl. ¶ 9.  So too for MacroPolicy.  Disclosure of its macroeconomic analysis in emails to the Board "would undermine MacroPolicy's competitiveness" and damage its reputation because its clients rely on the firm's discretion.  Coronado Decl. ¶ 12.  And MacroPolicy articulates one final foreseeable harm:  if its information

were to be disclosed, it might be less likely to voluntarily disclose such information to the government again.  *See id.* ¶ 12; Def.'s MSJ at 40.

These are textbook articulations of foreseeable harm.  The declarants "concretely explain how disclosure would cause harm" to an interest Exemption 4 protects by articulating a "link between the specified harm and the specific information contained in the material withheld."  *WP Co. LLC v. SBA*, 575 F. Supp. 3d 114, 119–20 (D.D.C. 2021) (cleaned up); *accord Reps. Comm.*, 3 F.4th at 369–71.  Despite Greenspan's bare assertion to the contrary, the Court finds that the Board has satisfied the foreseeable harm requirement.  Its Exemption 4 withholdings are proper.

### B.

The Board withheld over 1600 documents under Exemption 5.  *See* Def.'s MSJ at 7 n.5; Caperton Decl. ¶ 17.  The Board groups these documents into four categories.  *See* Def.'s MSJ at 15–26.  But the dispute before the Court is much narrower:  Greenspan challenges only 24 groups of documents.  *See* Pl.'s MSJ at 2–5.

Recall that Exemption 5 protects records from disclosure "that would not be available by law to a party other than . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  The Board cites the deliberative process privilege, a form of executive privilege, *see Sears*, 421 U.S. at 150, as the basis for its Exemption 5 withholdings, *see* Def.'s MSJ at 7.  The deliberative process privilege "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it."  *Sierra Club*, 141 S. Ct. at 785.

The privilege "protect[s] agencies from being forced to operate in a fishbowl."  *Id.* (cleaned up).  It "is rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  *Id.* (cleaned up).  The privilege ensures that subordinates "will feel free to provide the

decisionmaker with their uninhibited opinions and recommendations" without fear of public ridicule. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). And the privilege "guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action" that the agency ultimately rejected. *Id.* In short, the privilege "prevent[s] injury to the quality of agency decisions" that may occur if the "prior communications and the ingredients of the decisionmaking process are [] disclosed." *Sears*, 421 U.S. at 151; *accord Machado Amadis*, 971 F.3d at 371.

To qualify for the privilege, a document must be both predecisional and deliberative. A document is predecisional if the agency generated it before its final decision on a matter. *See Sierra Club*, 141 S. Ct. at 786. A document is deliberative if the agency prepared it to "help the agency formulate its position." *Id.*; *see also Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) (explaining that a document is deliberative if it is "part of the give-and-take" of the process through which the agency reached a final decision). And when assessing whether withheld information qualifies for the privilege, "categorization and repetition provide effective vehicles for reviewing an agency's withholding decisions when they implicate the same exemption for similar reasons." *Reps. Comm.*, 3 F.4th at 368.

With these standards in mind, the Court addresses each of the Board's four categories.

### 1.

As a threshold matter, the Board properly shows through its declarations and *Vaughn* indices that the emails and attachments it withheld under Exemption 5 meet the inter- or intra-agency requirement. *See* Def.'s MSJ at 12–13. The Board is an "agency" for FOIA purposes. *See* 5 U.S.C. § 552(f) ("agency" includes "any independent regulatory agency"). The Board's declarants assert that most documents the Board withheld are emails and attachments sent among

Board staff, other Board members, and Powell.  *See* Decl. of Antulio Bomfim (Bomfim Decl.) ¶ 9, ECF No. 11-7; Decl. of Michelle Smith (Smith Decl.) ¶ 6, ECF No. 11-5; Decl. of Beth Anne Wilson (Wilson Decl.) ¶ 6, ECF No. 11-8; Decl. of Andreas Lehnert (Lehnert Decl.) ¶ 6, ECF No. 11-6.  These communications are intra-agency because Board members and staff exchanged them and did not disclose them publicly.  *See* 5 U.S.C. § 552(b)(5); *see also Dep't of Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 9 (2001).

That said, the Board exchanged some of the withheld emails with non-agency staff. Certain of the withheld emails included staff members of the Federal Reserve Banks, *see* Smith Decl. ¶¶ 3, 7; Bomfim Decl. ¶ 8; Wilson Decl. ¶ 6; Lehnert Decl. ¶ 5, and one email string included a former Board employee, *see* Bomfim Decl. ¶ 8.  None are "agencies" within the meaning of FOIA.  *See* 5 U.S.C. § 552(f); *see also McKinley v. Bd. of Governors of Fed. Res. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011).  But the D.C. Circuit has held that under the "consultant corollary" to Exemption 5, this Court may "interpret intra-agency to include agency records containing comments solicited from nongovernmental parties."  *McKinley*, 647 F.3d at 336 (cleaned up).  The Board's declarants adequately explain that that Board relied on Federal Reserve Bank staff and a former board employee as consultants in its deliberations before specific meetings, speeches, and press conferences.  *See, e.g.*, Bomfim Decl. ¶ 9–10 (explaining the role that these consultants play in the Board's decision-making).

Greenspan does not challenge the Board's assertion that these communications satisfy Exemption 5's inter- or intra-agency threshold requirement.  *See generally* Pl.'s MSJ; *see also* Def.'s Reply at 1.  For these reasons, the Court finds that the Board has properly demonstrated that the withheld communications satisfy the exemption's threshold requirement.

**2.**

Category 1 covers "emails and attachments preparing Chair Powell and Board members for upcoming Federal Open Market Committee (FOMC) meetings, FOMC press conferences, and matters relating to monetary policy and the U.S. economy."  Def.'s MSJ at 15.  The Board's primary declarant for this category is Antulio Bomfim, a Senior Advisor of the Board and former special advisor to the Chair.  *See* Bomfim Decl. ¶ 1.

First up are communications predating FOMC meetings.  *See* Bomfim Decl. ¶¶ 15–16 (listing Bates ranges corresponding to *Vaughn* index).  Bomfim explains that the FOMC meets eight times a year to "review[] economic and financial conditions, determine[] the appropriate stance of monetary policy, and "assess[] the risks to its long-run goals of price stability and maximum employment."  *Id.* ¶ 5.  Prior to these meetings, Federal Reserve staff circulate briefing materials to "advise Chair Powell and Board and FOMC members" about current domestic and international financial markets and any risks.  *Id.*

The communications contain the staff's "confidential analyses and forecasts regarding the condition of the U.S. economy and financial markets, likely trends in economic conditions in the U.S. and abroad, [and] risks facing the U.S. economy[.]"  *Id.* ¶ 10.  The withheld emails and attachments also contain the staff's "recommendations regarding the appropriate stance of monetary policy" and "Chair Powell's and other Board members' comments, observations, questions, and reactions to the documents."  *Id.*  Finally, some emails concern antecedent administrative matters to FOMC meetings, such as policy statements, calendars, and meeting minutes.  *See id.* ¶ 6.  And Bomfim explains that the emails and attachments in this sub-category all "pre-dated or preceded in time Chair Powell's attendance at FOMC meetings."  *Id.* ¶ 9.

Greenspan challenges several documents in this category.  *See* Pl.'s MSJ at 2–3.  He argues that the Board's descriptions "fail to pinpoint the particular decisions or policies being deliberated or lack the required specificity for adversarial testing."  *Id.* at 2.[5]  He also contends that the Board improperly states for several documents that the communications were "in advance of," rather than "in preparation for" certain meetings and thus that the privilege fails.  *Id.* at 5.[6]

The Court disagrees.  The Board has shown that the emails and attachments preceding the FOMC meetings fall within the deliberative process privilege.  These communications exchanged between subordinates and higher-ups are predecisional because they helped Powell prepare for meetings throughout the year.  *See* Bomfim Decl. ¶¶ 15–16; *see Advancement Project v. DHS*, 549 F. Supp. 3d 128, 138 (D.D.C. 2021).  The Board's *Vaughn* index shows that the communications predated FOMC meetings.  *See, e.g.*, Def.'s Reply at 21 (citing Ex. K at 77 (FRB_FOIA F-2021-128 000749-51, dated July 26, 2020—two days before a FOMC meeting)).  And they are deliberative because they reflect "subordinates' analyses and recommendations before meetings where participants hashed out decisions."  *Advancement Project*, 549 F. Supp. 3d at 140; *see also Reps. Comm.*, 3 F.4th at 364 (finding emails deliberative where they contain a "back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and preserve" agency policy).  That the Board's *Vaughn* indices show that the vast

---

[5]  These documents are FRB_FOIA-F-2021-128 000510-514, FRB_FOIA-F-2021-132 000519-520, FRB_FOIA-F-2021-132 000649-654, FRB_FOIA-F-2021-132 000671-674, FRB_FOIA-F-2021-128 000019-20, and FRB_FOIA-F-2021-128 000269-270.  The Board also withheld FRB_FOIA-F-2021-128 000269-270 under Exemption 4, and as explained in Part III.B, the Court finds that the Board properly withheld it under that exemption, too.

[6]  These documents are FRB_FOIA-F-2021-128 000749-751, FRB_FOIA-F-2021-128 000010-13, and FRB_FOIA-F-2021-128 00016-19.

majority of the emails flowed from subordinates to Powell and other Board members bolsters this conclusion.  *See Abtew v. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015) (explaining that a "recommendation to a supervisor on a matter pending before the supervisor is a classic example of a deliberative document"); *accord Machado Amadis*, 971 F.3d at 370 ("[R]ecommendations from subordinates to superiors lie at the core of the deliberative-process privilege.").

To be sure, the description for FRB_FOIA F-2021-128 000019-20 by itself ("email between then-Governor Powell and a high-level FRS staff member commenting on issues relating to monetary policy") may not be enough on its own.  *See* Bomfim Decl. ¶ 9.  But the Bomfim declaration sufficiently explains that Powell considered all withheld documents in this category in deliberation leading up to Committee meetings.  *See, e.g.*, *id*.  The Board can use a combination of sources to meet its summary judgment burden.  *See, e.g.*, *Reps. Comm. for Freedom of the Press v. FBI*, 548 F. Supp. 3d 185, 192 (D.D.C. 2021).  It does so here.

Second are documents preceding FOMC press conferences.  *See* Bomfim Decl. ¶¶ 25–26 (listing Bates ranges corresponding to *Vaughn* index).  Powell typically gives prepared remarks at such conferences after FOMC meetings.  *See id.* ¶ 19.  To assist him, Federal Reserve staff draft and circulate possible questions and responses.  *See id.* ¶ 20.  And they provide their general thoughts, analyses, and impressions.  *See id.*  The emails and attachments thus contain the staff's "frank and unvarnished assessments and analyses" as well as Powell and other senior staff members' comments in response.  *Id.* ¶ 22.  And the draft questions and answers are "essential to Chair Powell's preparation for the press conferences in order to hone the message" he delivers about the monetary policy stance the FOMC has adopted.  *Id.*

Greenspan does not challenge any withheld documents in this subcategory, and the Court is satisfied that the deliberative process privilege protects them.  Emails and attachments sent

before the press conference are predecisional because they were generated before the Board's final statement of its position at the press conference itself. *See Sierra Club*, 141 S. Ct. at 786; *see also Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987). And they are deliberative because staff prepared them to help Powell formulate the Board's position. *See Sierra Club*, 141 S. Ct. at 786. These emails and attachments are thus exempt from disclosure.

Third are "ad hoc emails and attachments." Bomfim explains that Federal Reserve System staff and Board members often communicate "to exchange information, data, observations, and questions" to prepare for "ongoing decisions relating to the U.S. economic and financial markets." Bomfim Decl. ¶ 5; *see also id.* ¶¶ 17–18 (listing Bates ranges corresponding to *Vaughn* index). The Board characterizes these documents as predecisional and deliberative even though they do not prepare Powell for a specific meeting or press conference. *See* Def.'s MSJ at 18.[7]

The Board contends that these emails and attachments involve staff and Board members, including Powell, "mak[ing] recommendations or express[ing] opinions on legal or policy matters." Def.'s MSJ at 17. Such legal and policy matters include "draft remarks regarding monetary policy normalization," "staff[] review and analysis of a paper presented at a recent U.S. monetary policy forum for Powell's consideration and questions," "expectations for balance sheet normalization," and "quantitative easing." Bomfim Decl. ¶ 18; *see also* Ex. L (*Vaughn* Index).[8] And the *Vaughn* index explains that these communications contain "[i]nternal

---

[7] At least one of the documents does prepare Powell for a specific speech, though not one at a FOMC meeting. *See* Bomfim Decl. ¶ 18 (describing FRB_FOIA F-2021-132 00270-295, which includes draft remarks for an upcoming Bank of England panel on unconventional asset purchases).

[8] The Board also withheld several documents in this category under Exemption 4. *See* Bomfim Decl. ¶ 18 (describing FRB_FOIA F-2021-132 000672, an email and attachment commenting on

17

deliberative pre-decisional analyses and recommendations" from Federal Reserve staff.  *See, e.g.*, *Vaughn* Index, Ex. K at 23.

Greenspan challenges several withheld documents in this category, again arguing that the Board "fail[s] to pinpoint the particular decisions or policies being deliberated" and that its descriptions "lack the required specificity for adversarial testing."  *See* Pl.'s MSJ at 2.

Though this subcategory is a closer call than the prior two because no future meeting or decision is described, the Court finds that the Board properly asserted the deliberative process privilege.  The D.C. Circuit has recognized that an agency need not pinpoint an ultimate decision to which the document contributes to assert the privilege.  *See Access Reps. v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (citing *Sears*, 421 U.S. at 151 n.18); *accord Reps. Comm.*, 3 F.4th at 363.  Indeed, "[a]ny requirement of a specific decision *after* the creation of the document would defeat the purpose of the exemption" because "the author could not know whether the decision-making process would lead to a clear decision, establishing the privilege, or fizzle, defeating it." *Access Reps.*, 926 F.2d at 1196.  In other words, "the privilege may extend to internal deliberations over how best to promote or preserve an existing policy" such as when "high-ranking officials [are] debating how to formulate the most appropriate and effective response to an ongoing national controversy."  *Reps. Comm.*, 3 F.4th at 363; *see also Coastal States*, 617 F.2d at 866 ("Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position.").

---

analysis from MacroPolicy Perspectives LLC, and FRB_FOIA F-2021-132 000269-270, an email commenting on analysis submitted by Tudor Investment Corporation).

So too here.  The Board withheld "internal, pre-decisional" emails between then-Governor Powell and a high-level staff member commenting on "issues relating to monetary policy," plus emails between Powell and a high-level staff member "discussing quantitative easing" and "recent financial market developments, market volatility . . . and yield curve control."  Bomfim Decl. ¶¶ 17–18.  The Board also withheld an email and attachment between former Board staff member Fabio Natalucci who was serving as a consultant to the Board on economic matters.  *Id.* ¶¶ 8, 18.  Bomfim explains that these communications contain staff members' confidential analyses and forecasts about the economy and form part of the ongoing cycle of preparing Powell and other Board members for upcoming decisions.  *See id.* ¶¶ 5, 9–10.  The Court is satisfied that these communications include the "give-and-take" of the consultative process.  They reflect "internal debate over how best to promote and to preserve" the Board's policy prerogatives vis-à-vis the economy.  The Board properly asserted Exemption 5 as to this category.

### 3.

The second category covers emails and attachments relating to international economic matters.  *See* Def.'s MSJ at 19–22.  The Board's primary declarant here is Beth Ann Wilson, the Board's Director of International Finance.  *See* Wilson Decl. ¶ 1.  Greenspan challenges several batches of documents within this category.  *See* Pl.'s MSJ at 3, 5.

*First*, Wilson explains that Powell "attends and makes remarks before international economic bodies," including the G7, G20, International Monetary Fund, and European Central Bank.  Wilson Decl. ¶ 7; *see also id.* ¶ 15 (listing Bates ranges corresponding to *Vaughn* index).  There, Powell "meets with officials . . . on matters affecting international economic and financial markets and, directly or indirectly, the U.S. economy and financial markets or market

participants." *Id.* In preparation for these meetings, Federal Reserve staff "typically prepare a briefing book for Chair Powell and other Board members and high-level [Federal Reserve System] staff" containing their "views and analyses of international economic conditions and developments in international markets." *Id.* ¶ 8. More, the emails and attachments "often contain or are based on sensitive, non-public information regarding overseas financial markets and economies, including confidential information" from conversations with foreign financial leaders. *Id.*

The Board asserts that Powell used this information "in the process of deliberation leading up to his attendance and remarks at international economic meetings" or during the "Board's ongoing decision-process on international economic matters." *Id.* ¶ 6. And the Board explains that the communications "pre-dated or preceded in time the final remarks or international meetings for which they served as preparation." *Id.*

*Second*, the Board asserts that it withheld Federal Reserve staff's regular, weekly briefings to the Board and senior staff about "developments at international economic meetings." *See id.* ¶ 16; *see also id.* ¶¶ 20–21 (listing Bates ranges corresponding to *Vaughn* index). Wilson explains that in compiling these briefings, the staff "applies its expertise in international economic matters . . . to select materials that are most pressing and time-sensitive for Chair Powell's and Board members' consideration[.]" *Id.* ¶ 16. These briefings also contain information that the staff "received in confidence from foreign counterparts." *Id.*

*Third*, the Board withheld ad hoc emails exchanged between staff and Powell that provide "analyses, commentary, and input on real-time information" and "seek Chair Powell's and Board members' input on draft publications, speeches, or other matters affecting the U.S. or international financial markets." *Id.* ¶ 17; *see also id.* ¶ 22 (listing Bates ranges corresponding to

*Vaughn* index).  The Board asserts that these emails are "part of the Board's decision-making process with regard to the specific issue, publication or speech addressed in the email."  *Id.* ¶ 17. They also inform "the ongoing decision-making process of keeping Chair Powell and Board members informed . . . so that they can better anticipate and respond" to developments in international markets.  *Id*.

Greenspan challenges several batches of documents in this category.  *See* Pl.'s MSJ at 3, 5.[9]  As before, he challenges some because they "fail to pinpoint the particular decisions or policies being deliberated or lack the required level of specificity for adversarial testing."  *Id.* at 2.

The first batch of documents includes a number of "email[s] and attachment[s] from Board staff in [International Finance] to Chair Powell and Board members, copying FRS staff, attaching [International Finance] Meetings Weekly News."  Wilson Decl. ¶ 21.  And the second group includes an "email and attachment from Chair Powell to an FRS staff member attaching [a] document regarding financial market uncertainty."  *Id.* ¶ 22.

The Court finds that the Board properly asserted Exemption 5 as to these documents. Recall that the Board need not pinpoint a specific decision to which these documents relate to satisfy Exemption 5.  *See Sears*, 421 U.S. at 151 n.18; *see also Access Reps.*, 926 F.2d at 1196–97.  And the Wilson declaration adequately explains that the first document range is a series of "pre-decisional, deliberative periodic briefings" from staff to Powell and Board members. Wilson Decl. ¶ 20; *see also id.* ¶ 21.  These briefings reflect the Federal Reserve System staff's

---

[9] These ranges are FRB_FOIA F-2021-128 000982-988, FRB_FOIA F-2021-132 000460-463, FRB_FOIA F-2021-132 000523-525, FRB_FOIA F-2021-132 000614-615, FRB_FOIA F-2021-132 000640-641, FRB_FOIA F-2021-132 000647-648, FRB_FOIA F-2021-132 000676-683, and FRB FOIA F-2021-132 000059-60.

judgment about which items are most pressing for the Board members to address.  *See id.* ¶ 16.

And they play a "critical role" in the "Board's ongoing decision-making process of monitoring

and responding to international economic developments."  *Id.*  Though factual material is

typically not protected by the deliberative process privilege, factual material culled and presented

to decision-makers through exercises of discretion may be.  *See, e.g.*, *Ancient Coin Collectors

Guild v. DOS*, 641 F.3d 504, 513 (D.C. Cir. 2011).  The Board has adequately explained that the

weekly briefings contain the type of factual information that the deliberative process privilege

protects.

Exemption 5 covers the second document Greenspan challenges too.  It is an email from

Powell providing commentary that is part of the Board's ongoing decision-making process "with

regard to the specific issue . . . addressed in the email"—financial market uncertainty.  Wilson

Decl. ¶ 17.  It is therefore deliberative with respect to the Board's ongoing responsibilities to

"anticipate and respond to [] development[s]" in markets.  *Id.*; *cf. Reps. Comm.*, 3 F.4th at 363

(finding predecisional and deliberative emails that were "part of an internal dialogue about

critical judgment calls aimed at advancing the agency's interests in the midst of a vigorous public

debate about [a policy] with a decidedly uncertain future at the time").  That Powell sent the

document to a subordinate does not defeat the privilege.  *See id.* at 364 (rejecting any such

"directional precondition to protection under the deliberative process privilege").  There is no

sign that Powell "was providing any sort of direction or explaining the basis for a final decision

to his subordinates," in which case the "privilege's application would be more tenuous."  *Id.*

Greenspan also challenges a third document in this category by arguing that the Board's

description relates it to a previous meeting, rather than a future decision.  *See* Pl.'s MSJ at 5.[10]  It

_____

[10]  Describing FRB_FOIA F-2021-132 000003-009.

is an email and attachment from staff to Powell and high-level Federal Reserve staff members "providing staff analyses regarding policy-relevant discussions at a recent meeting." Wilson Decl. ¶ 22. As the Board explains, staff often exchange such emails with Board members "so that they can better anticipate and respond to" future shifts in domestic and international financial markets. *Id.* ¶ 17. And the Board claims that this challenged document played a "part in the Board's ongoing decision-making process . . . on international" economic matters. *Id.*

This is a closer call than the other documents Greenspan challenges. If all the Court had was the Board's *Vaughn* Index description—which does seem to relate the document to a completed meeting—it would not pass muster. *See Reps. Comm.*, 567 F. Supp. 3d at 113 (finding that an email and attachments sent after the decision to which it corresponds was made does not qualify for the deliberative process privilege). But the combination of the Board's *Vaughn* index description and its declarations just enables it to meet its burden. The Board argues that this email and attachment commenting on a prior meeting will help Board members "better anticipate and respond" to future market developments. Wilson Decl. ¶ 17. So the Board situates this document within its ongoing deliberative processes.

### 4.

The third category covers emails and attachments relating to upcoming speeches, public appearances, meetings, and congressional testimony by Powell. *See* Def.'s MSJ at 22–24; *see also* Smith Decl. ¶ 18 (listing Bates ranges corresponding to *Vaughn* index). The Board's primary declarant here is Michelle Smith, an Assistant to the Board who helps facilitate communication between the Board and Congress. *See* Smith Decl. ¶ 2. Greenspan challenges

only one group of documents in this category.  *See* Pl.'s MSJ at 4.

Smith explains that Powell "gives speeches, delivers remarks, participates in meetings

and calls, makes public appearances and testifies before Congress" on a wide range of financial

and economic topics.  Smith Decl. ¶ 8.  In preparation for these various appearances, Federal

Reserve staff send Powell emails "discussing his ideas for the speech, objectives, the target

audience, [and] possible questions he may be asked."  *Id.*  More, staff often circulate drafts,

outlines, or ideas for upcoming appearances.  *See id.*  Sometimes, Powell solicits staff views.

*See id.* ¶ 9.

According to Smith, these emails and attachments "play an integral part in the iterative

process of comment and response leading up to the finalization of Chair Powell's speeches,

remarks, Congressional testimony, meetings, and public appearances."  *Id.* ¶ 8.  The information

they contain is "essential to ensure that information in final speeches" is "complete, accurate, and

up-to-date[.]"  *Id.* ¶ 10.  And they are vital to "prioritiz[ing] topics and calibrat[ing] the tone and

content of [Chair Powell's] remarks."  *Id.*

 Greenspan challenges one document in this category.  *See* Pl.'s MSJ at 4.  It is an

"internal FRS email and attachment preparing Chair Powell for [an] upcoming call with [a]

member of the Senate."  Smith Decl. ¶ 17.  As before, Greenspan argues that this description

"fail[s] to pinpoint the particular decision or policies being deliberated" and "lack[s] the required

specificity for adversarial testing."  Pl.'s MSJ at 2.

The Court disagrees.  The Board has adequately explained why this email and attachment

qualify for the deliberative process privilege.  They are predecisional because they prepared

Powell for an upcoming meeting with a Senator.  *See* Smith Decl. ¶¶ 8, 10; *see also Abtew*, 808

F.3d at 899 ("A document is predecisional if it precedes, in temporal sequence, the decision to

24

which it relates.").  And the communication is deliberative because it presented ideas to Powell on proposed topics, phrases, and word choices, and informed him about matters that might shape his views in preparing for the call.  *See* Smith Decl. ¶¶ 8, 10.  Such advice from staff helped ensure that his final remarks were accurate and delivered with the appropriate tone.  *See id.* ¶ 10; *see also Advancement Project*, 549 F. Supp. 3d at 139 ("Determining how to explain an agency decision in response to inquiries from . . . Congress . . . is itself a privileged deliberative process.").  The Court thus finds that the Board has properly asserted Exemption 5 as to this category.

### 5.

The fourth category covers emails and attachments relating to financial stability and the interaction between financial stability and monetary policy.  *See* Def.'s MSJ at 25–26; *see also* Lehnert Decl. ¶ 12 (listing Bates ranges corresponding to *Vaughn* index).  The Board's primary declarant for this category is Andreas Lehnert, the Director of Financial Stability at the Board. *See* Lehnert Decl. ¶ 1.  Greenspan challenges five groups of documents in this category.  *See* Pl.'s MSJ at 3–4.

Lehnert explains that the communications in this category predated and helped prepare for several reports the Board issued, Committee meetings that Powell attended, or other meetings and decisions related to financial stability.  *See* Lehnert Decl. ¶ 6; *see also id.* ¶¶ 2, 5.  For example, the Board prepared semi-annual Financial Stability Reports and commented on draft Financial Stability Oversight Council annual reports because the Board Chair sits on the Council. *See id.* ¶ 6.  The Board considered a number of the communications in this category "in the process of deliberation leading up to the preparation of" these reports.  *Id.* ¶ 6.  And the withheld emails and attachments "contain Chair Powell's, Board members' and staff's candid and

forthright opinions, impressions, questions, and analyses on matters relating to the preparation of final" Financial Stability and Financial Stability Oversight Council reports. *Id.* ¶ 7.  More, the communications contain candid opinions about, and reactions to, the stability of financial institutions, financial markets, and the risks facing the U.S. economy which "served as preparation for, or predated or preceded in time attendance at meetings" or "served as preparation [for] . . . decisions regarding financial stability or monetary policy matters." *Id.* ¶ 6.

Greenspan challenges five batches of documents in this category.  *See* Pl.'s MSJ at 3–4.[11]  The emails and attachments at issue contain comments from Powell and high-level Federal Reserve staff about the interaction between financial stability and monetary policy, including a stock market bubble, low interest rates, and market conditions.  *See* Lehnert Decl. ¶ 11.  And again, Greenspan argues that these descriptions "fail to pinpoint the particular decision or policies being deliberated" and "lack the required specificity for adversarial testing."  Pl.'s MSJ at 2.

The Court disagrees.  The Board explained that its members considered these documents when preparing for meetings and in the ongoing process of determining financial stability or monetary policy, rendering them pre-decisional.  *See* Lehnert Decl. ¶ 6.  The Board has also shown that these documents are deliberative because they involve an ongoing decision-making process about financial stability and monetary policy—matters of "continuing, iterative assessment, analysis, and policy adjustments."  Def.'s Reply at 16; *see also* Lehnert Decl. ¶¶ 2, 6.  As explained, the Board need not pinpoint a specific decision to which these documents relate to satisfy Exemption 5.  *See Sears*, 421 U.S. at 151 n.18; *see also Access Reps.*, 926 F.2d at 1196–

---

[11]  Greenspan challenges the Board's assertion of Exemption 5 as to FRB_FOIA F-2021-128 000015–18, 21-21, FRB_FOIA F-2021-128 000249-251, 405, FRB_FOIA F-2021-128 000515-517, FRB_FOIA F-2021-128 000909-10, and FRB_FOIA F-2021-128 000938.

97.  The Board has appropriately described that these emails constitute "the type of back and forth exchange of ideas, constructive feedback, and internal debate . . . that sits at the heart of the deliberative process privilege." *Reps. Comm.*, 3 F.4th at 364; *see also Advancement Project*, 549 F. Supp. 3d at 140 (finding that briefing materials containing subordinates' analyses and recommendations before meetings where participants made decisions qualify for the privilege). The Court thus finds that the Board has properly asserted Exemption 5 as to this category.

*   *   *

Greenspan levies another challenge to 20 of the document ranges he challenges:  that the Board's descriptions are like others that some courts have found inadequate.  *See* Pl.'s MSJ at 4. Not so.

Greenspan points to this Court's decision in *Reporters Committee for Freedom of the Press v. United States Customs and Border Protection*, which found several of the agency's explanations for withheld documents inadequate.  But there, the agency "fail[ed] to show, much less contend, that the [withheld information] related to a decision that came later."  567 F. Supp. 3d at 112.  The agency merely relied on perfunctory statements that the withheld information "relat[ed] to the deliberative process."  *Id.*  The Board's evidence here is stronger.  Importantly, the Board contends that the emails and attachments it withheld both preceded in time and helped prepare for various meetings, speeches, press conferences, and internal decisions.  *See, e.g.*, Bomfim Decl. ¶ 9; Wilson Decl. ¶ 6; Lehnert Decl. ¶ 6; Smith Decl. ¶ 6.  Greenspan's citation to *Electronic Frontier Foundation v. Department of Justice* is similarly unpersuasive.  There, the court found that the agency failed to describe what role the withheld emails played in the agency's deliberative process.  *See* 826 F. Supp. 2d 157, 169 (D.D.C. 2011).  As explained, the Board has carried its burden here.

27

Greenspan's other authorities do not help him, either.  *Center for Investigative Reporting v. United States Customs and Border Protection* found an agency's assertion of the deliberative process privilege unsuccessful where the agency failed to describe the "deliberative process to which the withheld records relate, the decisionmaking authority, and the chronology."  436 F. Supp. 3d at 101.  The Board does all three.  *See* Part III.C.2–4 (explaining that the Board adequately described the deliberative process to which the documents relate); *see also id.* (describing how the withheld records preceded and helped Board members prepare for meetings, speeches, and ad hoc decisions); *see generally Vaughn* Indices (describing the sender and recipient of the documents).  And unlike in *Muttit v. Department of State*, which Greenspan also invokes, the Board has not "failed to provide sufficient information" by merely offering "conclusory quotations from case law that describes the kind of material normally exempt from disclosure."  926 F. Supp. 2d 284, 306–07 (D.D.C. 2013).  Indeed, the Board's evidence in this case, including an array of declarations from various senior staffers and other subject matter experts, is notable for its thoroughness and detail.  For the reasons discussed in Part III.C.2–4, the Board has proven its Exemption 5 claims.

### 6.

Recall that the Board must also show that release of the withheld documents would foreseeably harm an interest protected by Exemption 5.  *See Reps. Comm.*, 3 F.4th at 369–70. The Board must explain any foreseeable harm in a "focused and concrete" way and "in the specific context of the agency action at issue."  *Id.* at 370.  The Board cannot merely state that disclosure "could . . . adversely impair internal deliberations" or chill inter-agency speech generally; it must argue that disclosure *would* have that effect in the relevant context.  *Id.* at 369– 70.  To do so, the Board "may take a categorical approach" and "group together like records" to

explain the foreseeable harm of disclosure for each category.  *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  The Board does so here, explaining the foreseeable harm for each of the four categories described above.  *See* Def.'s MSJ at 26–37.

Greenspan contends that because the Board fails to prove its Exemption 5 claims, it also fails to show foreseeable harm.  *See* Pl.'s MSJ at 5.  But as explained above, the Court finds that the Board properly asserted Exemption 5.  And the Court now holds that the Board has satisfied its foreseeable harm burden, too.

*First*, the Board argues that disclosure of the emails and attachments preparing for upcoming FOMC meetings, similar emails and attachments relating to the domestic economy, and post-Committee meeting press releases would cause foreseeable harm.  *See* Def.'s MSJ at 27–29; Bomfim Decl. ¶¶ 10, 12–13, 22.  These documents include "highly confidential," internal-use-only briefing documents for Powell containing staff analysis about matters affecting the U.S. economy and financial markets.  Bomfim Decl. ¶¶ 10, 12.  Bomfim explains that release of these communications would lead staff and Powell to be "much more circumscribed in their comments, observations, and analyses and less likely to include sensitive or confidential information, analyses, forecasts or recommendations[.]"  *Id.* ¶ 12.  Staff would be "reluctant to include a full range and robust discussion of options in responding to U.S. economic conditions[] and the possible risks and benefits of various courses of action."  *Id.* ¶ 13.  This is so because staff would be concerned that such information "could be misinterpreted, misconstrued, or prematurely acted upon by financial markets, market participants, government officials, or consumers."  *Id.* ¶ 12.

The result?  The Federal Reserve System's "quality, completeness[,] and robustness" of its pre-decisional briefing materials would suffer, potentially impeding the Board's ability to

adequately respond and make informed decisions at FOMC meetings and more generally.  *Id.* ¶ 13.  More, the quality of staff and Powell's preparation for post-Committee press conferences, and his responses, comments, and questions at the conferences themselves, would suffer.  *Id.* ¶ 22.

The Board has met its foreseeable harm burden for the documents related to FOMC meetings, the domestic economy, and post-Committee press conferences.  The Board has explained that release of the information would chill candid advice within the Federal Reserve system, which the deliberative process privilege exists to protect.  *See Machado Amadis*, 971 F.3d at 371.  But beyond that semi-generic rationale, the Board has also shown that staff recommendations would be chilled because of fear that their sensitive, confidential economic analyses could be misconstrued or prematurely acted on by financial markets, market participants, government officials, or consumers.  *See, e.g.*, Bomfim Decl. ¶ 12.

The Board's evidence is far from a "perfunctory statement" that disclosure "would jeopardize the free exchange of information."  *Reps. Comm.*, 3 F.4th at 370.  The Board shows how deliberation would be chilled between specific decisionmakers in a particular context, and the likely result on financial markets and stakeholders.  The Board's declarant also indicates that release would confuse the public, a result the D.C. Circuit has long recognized "has special force with respect to disclosures of agency positions or reasoning concerning proposed policies."  *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1436 n.10 (D.C. Cir. 1992) (emphasis deleted).  The Board therefore says something "new about the harm of disclosure" and "link[s] the possibility of that harm to the information in this category."  *Reps. Comm.*, 567 F. Supp. 3d at 115.  So it has satisfied its foreseeable harm burden for the documents listed in the Bomfim

30

declaration.

    *Second*, the Board argues that public disclosure of the emails and attachments preparing

Powell for international economic meetings and weekly staff briefings about international

economic meetings would cause foreseeable harm.  *See* Def.'s MSJ at 29; Wilson Decl. ¶ 11.

The Board similarly asserts that disclosing this information would make staff "much more

circumscribed in their comments and analyses" because they would hesitate to include things

that "could be misinterpreted or negatively perceived by financial markets, market participants,

government officials, or the public."  Wilson Decl. ¶ 11.  The Board also explains that releasing

this "sensitive, non-public information"—some of which the Board receives on condition of

confidentiality from foreign governments—"would foreseeably harm the Board's ability to

effectively represent the United States" in international economic meetings.  *Id.* ¶ 18.  This is so

because other meeting participants and foreign officials "would be reluctant to share information

that they did not want disclosed publicly."  *Id.*  Again, the Board properly links the harm of

disclosure to the specific context of international economic meetings and external discussions

with foreign leaders.  *See Reps. Comm.*, 3 F.4th at 370; *cf. Cause of Action Inst. v. Ex.-Im. Bank

of the U.S.*, 521 F. Supp. 3d 64, 80 (D.D.C. 2021) (finding foreseeable harm "manifestly evident"

where the government alleged that disclosure would inhibit frank discussions in a particular

context and potentially undermine its negotiating position with other parties).

    The Court also finds that the "context and purpose" of some documents within these two

declarations support a finding of foreseeable harm.  *See Reps. Comm.*, 3 F.4th at 372.  As the

Board explains, certain documents described in the Bomfim and Wilson declarations contain

"sensitive, non-public information" about international economic matters, Federal Open Market

Committee meetings, the U.S. economy, and monetary policy.  *See* Def.'s MSJ at 35 (citing

31

Bomfim Decl. ¶¶ 15–18, 25–26 and Wilson Decl. ¶¶ 15, 20–22).  For example, the Board explains that briefing materials prepared for international economic meetings often contain nonpublic information from foreign governments and central banks on condition of confidentiality.  *See* Wilson Decl. ¶¶ 8, 16, 18.  Similarly, the Board explains that disclosure of emails to Powell in preparation for FOMC meetings could cause "public confusion, market disruptions, and other harm to the U.S. economy, financial markets, market participants, and consumers."  Bomfim Decl. ¶ 23.  And the Board notes that for some emails and attachments "circulation *within* the Federal Reserve system is strictly limited."  *Id.* at 21 (emphasis added); *see also id.* ¶ 10.

As Greenspan himself acknowledges, "Chair Powell's words have the power to move markets and alter the world economy."  Compl. ¶ 11.  Thus, even for documents in the Bomfim and Wilson declarations where the Board's description is less specific, the Court is satisfied that the information within the communications has the power to sow confusion and disrupt financial markets if disclosed.  *See, e.g.*, Bomfim Decl. ¶¶ 14, 18.  More, the fact that disclosure could diminish the Board's status in the eyes of its foreign counterparts and impede its ability to implement monetary policy, all to the detriment of consumers, is a serious concern.  *Cf. Reps. Comm.*, 567 F. Supp. 3d at 129 (finding that details about how an agency conducts internal investigations of cybersecurity breaches supports a context-specific risk of foreseeable harm). The Court is satisfied that, as to the withheld information in the Bomfim and Wilson declarations, "the sensitivity of the context in which [these] conversations arose as well as their subject matter" and the "need for confidentiality" about the crafting of the Board's financial policy strategy and goals "provide the particularized context for a finding of foreseeable harm."

*Reps. Comm.*, 3 F.4th at 371–72 (finding that emails discussing sensitive undercover operations amidst a policy crisis provide the particularized context for a finding of foreseeable harm).

*Third,* the Board asserts that releasing the emails and attachments used to prepare Powell for upcoming speeches, public appearances, and Congressional meetings would cause foreseeable harm. *See* Def.'s MSJ at 30. The Board argues that if this information were disclosed, staff "would feel less free to make candid and unvarnished observations and comments and pose questions" to prepare him. Smith Decl. ¶ 10. Candid observations are "essential to ensure that information in final speeches, remarks, public appearances and testimony by Chair Powell is complete, accurate, and up-to-date." *Id.* And Powell himself "would feel less free to candidly comment on or edit drafts, or praise or disregard specific ideas" if he "was concerned that his candid comments or observations could possibly be misinterpreted by the public, government officials, financial markets participants, or consumers." *Id.* More, disclosure of interim discussions about the Chair's final remarks "would cause public confusion, as markets would be unable to distinguish between the Chair's final views . . . and inchoate ideas which were ultimately refined or possibly discarded in the vetting process." *Id.* ¶ 11; *cf. Reps. Comm.*, 567 F. Supp. 3d at 121 (finding that the government cleared its burden when it listed generic rationales and also showed that disclosure would confuse the public).

*Fourth*, the Board has met its foreseeable harm burden as to the emails and attachments about financial stability, bank capital, and monetary policy. *See* Lehnert Decl. ¶¶ 11–12. As for its other categories, the Board argues that premature disclosure of this information would make staff more reluctant to include a full range and robust discussion of options in its correspondence "to the detriment of Chair Powell's and the Board's ability to respond to [economic] conditions, causing harm to the U.S. economy, financial markets, market participants and consumers." *Id.* ¶

8.  And Lehnert explains that premature disclosure of the withheld information "would negatively impact the Board's ability to implement measures enhancing financial stability, and address risks to the U.S. economy and financial institutions, because private financial market participants would react in advance of what they believed to be possible Board action."  *Id.* ¶ 10. The Board has thus identified "specific harms to the relevant protected interests" and it has "connect[ed] the harms in a meaningful way to the information withheld."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106; *see also Rosenberg v. DOD*, 442 F. Supp. 3d 240, 260–61 (D.D.C. 2020) (finding foreseeable harm where the declarant stated that disclosure would inhibit "frank discussions" and impair efforts to ensure that leadership had the "full and necessary understanding" required for effective decisionmaking).

*Finally*, the Board discusses a foreseeable harm that transcends all its categories:  the potential for improper "tea-leaf reading" of Federal Reserve staff correspondence to divine why the Board changed or stayed its course.  *See, e.g.*, Bomfim Decl. ¶¶ 23–24; Smith Decl. ¶ 12; Lehnert Decl. ¶¶ 9–10; Wilson Decl. ¶¶ 12–14.  As Smith explains, Powell's "words are frequently analyzed to try to discern possible trends in interest rate decisions[,] . . . market interventions[,] . . . [and] possible shifts in the Federal Reserve's position on policy matters[.]" Smith Decl. ¶ 11.  So his final statements are "clear," "carefully vetted," and "calibrated" for public consumption.  *Id.*

Disclosing the Chair and his staff's incipient views in the withheld emails and attachments thus "would result in tea-leaf reading by the press, public[,] and financial market analysts as to why wording was changed, certain ideas were emphasized or downplayed, or why the tone or direction of a final speech, remarks, or testimony took a different tenor than in the draft."  *Id.* ¶ 12.  And as Bomfim explains, release of such "incomplete or inchoate information

that had not been fully vetted" could result in tangible harms such as "stock or bond market sell-offs or speculative buying, fluctuation in asset values, [and] unexpected changes in the direction of interest rates."  Bomfim Decl. ¶ 23; *accord* Wilson Decl. ¶ 14; *see also* Lehnert Decl. ¶ 9 (explaining that premature disclosure of information could cause movements in asset prices, resulting in "unanticipated losses to individual investors, pension funds, and other asset managers" and that "losses to specific financial institutions could cause them to retrench, reducing the credit supply to the economy").  So the Board persuasively articulates another reason why release of the information it withheld would foreseeably cause harm.

In *Reporters Committee*, the Circuit explained the raised bar for foreseeable harm.  The Board has decisively cleared it.  It explains many harms in a "focused and concrete" way and "in the specific context of the agency action at issue."  *Reps. Comm.*, 3 F.4th at 370.  And the sensitive context in which some communications took place also warrant a finding of foreseeable harm even if the Board's explanations had been insufficient.  *See id.* at 372.

## C.

Finally, the Board must "demonstrate that all reasonably segregable material has been released."  *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002).  To meet this burden, an agency may rely on its declarations and *Vaughn* Index.  *See id.*  And the agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Greenspan does not challenge the Board's assertion that it has released all reasonably segregable portions of the relevant records.  *See generally* Pl.'s MSJ; *see also* Def.'s Reply at 1.  And the Court finds that the *Vaughn* Indices and the Caperton declaration demonstrate that the Board reasonably determined which documents to disclose and which to withhold.  *See* Caperton

Decl. ¶¶ 17–18; *see also Vaughn* Indices.  The Board "carefully examined" each responsive document and determined that "any non-exempt information that might exist in those pages was so inextricably intertwined with exempt information" that any release would result in disjointed words or phrases.  Def.'s MSJ at 42; *see also* Caperton Decl. ¶¶ 17–18.  The Board has thus satisfied its segregability burden.

## IV.

This is an unusual deliberative process privilege case.  Many of the communications the Board withheld did not lead to a final, published agency action, such as an Executive Order or new policy.  But the Board has proved that each of Chairman Powell's official statements are themselves decisions, with significant repercussions in the financial markets.  So it properly withheld communications preceding these statements even if the final product was merely talking points for a press conference or meeting.  For the reasons above, the Court will grant the Board's motion for summary judgment and deny Greenspan's cross-motion.  A separate Order will issue today.

Dated:  December 1, 2022                                    _____
                                                                       TREVOR N. McFADDEN, U.S.D.J.